IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| FRACISCO JOEL RIVERA, on behalf of himself and all others similarly situated, | : : : : : | |
| Plaintiff, | : : : | CIVIL ACTION NO. 1:18-cv-4639-AT |
| v. | : : | |
| EQUIFAX INFORMATION SERVICES, LLC, | : : : | |
| Defendant. | : | |

## **OPINION AND ORDER**

Presently before the Court is the Magistrate Judge's Report and Recommendation [Doc. 98], recommending the denial of Plaintiff's Motion to Certify Class [Doc. 75]. Plaintiff has filed comprehensive objections to the R&R. The fundamental legal issue posed by the class certification motion at this juncture is whether common issues predominate and whether Plaintiff can establish class members' Fair Credit Reporting Act failure to reinvestigate claims with common evidence.

The plain text of Section 1681i of the Fair Credit Reporting Act provides that, where "the completeness or accuracy of any item of information" in a consumer's credit file is disputed by the consumer directly, a consumer reporting agency (like Equifax) "shall, free of charge, conduct a reasonable reinvestigation

to determine whether the disputed information is inaccurate" or, alternatively, can delete the information from the file. 15 U.S.C. § 1681i(a)(1)(A) (emphasis added). Here, hundreds of thousands of consumers sent letters to Equifax disputing the notation of one or more "hard inquiries" on their credit reports. A "hard inquiry" is a notation made by a credit reporting agency that reflects that a third-party entity—e.g., a cable company—inquired into and obtained a consumer's credit report in response to a consumer's application for credit. A "hard inquiry" notation may remain on a consumer's credit report for up to two years. Moreover, according to Plaintiff's expert evidence, one or more "hard inquiry" notations can negatively impact a consumer's credit score or his ability to obtain credit in the future. For a third-party data inquirer (e.g., a cable company) to obtain a consumer's credit report, it must have authorization from the consumer or a permissible purpose. *See* 15 U.S.C. § 1681b(a) and (f). Here, consumers sent letters to Equifax disputing as erroneous the notation a "hard inquiry" from a third-party data inquirer that the consumer never applied for credit with in the first place.

In response to the hundreds of thousands of letters disputing one or more of these "hard inquiry" notations, Equifax (1) commonly classified those letters as "not mine" or "unauthorized" disputes and (2) sent the same boilerplate letter in response to all of the consumers' letters. The form letter stated only that "[i]nquiries are a factual record of file access" and then directed the customers to contact the third-party data inquirers. Equifax itself did not contact the third-

party data inquirers, the customer, or anyone else to determine whether those data inquirers had obtained the customers' authorizations to pull their credit reports.

The common merits question of whether an unauthorized "hard inquiry" notation constitutes an "inaccuracy" under the FCRA is not directly before the Court currently. Rather, the present issue is whether Plaintiff's motion for class certification should be granted. The Magistrate Judge determined that it should not. However, as reasoned below, the Court finds that class certification should be granted as appropriate because: (1) Plaintiff has established that class members' claims can be proved by common evidence; (2) Equifax's contention that individualized inquiries will be extensively required is entirely speculative and supported by no particular evidence at this juncture; and (3) common issues predominate and all other factors relevant to class certification are satisfied.

## I.   BACKGROUND

**Mr. Rivera's Dispute**

Plaintiff Francisco Joel Rivera, who lives in Connecticut, has never lived in Maryland, has never signed up for cable services in Maryland, and has never had dealings with Hughes Cable Network Services, a provider of cable and internet services in Maryland. (Deposition of Francisco Joel Rivera ("Rivera Dep."), Doc. 76-1 pp. 4:2; 9:25-10:1; 13:13-16; 20:18-20.) Nevertheless, on November 17, 2016, Hughes Cable requested and obtained Rivera's credit file from Equifax. (*Id*. p. 32:11-16.) In accordance with normal processes, Equifax then placed a "hard

inquiry" notation in Rivera's credit file, reflecting that Hughes Cable had obtained Rivera's credit information. (*Id.* p. 32:17-24; Deposition of Mary Margaret Fortson Leslie ("Leslie Dep."), Doc. 76-2 p. 15:14-18.)

Shortly thereafter, Rivera was looking at his credit score and credit report and noticed that there was a notation of a hard inquiry from Hughes Cable, a company he was totally unfamiliar with and had never attempted to obtain any credit or services from. (Rivera Dep. p. 13:10-16.) Rivera originally worried that he might have been a victim of identity theft. (*Id.* p. 28:5-13.) Rivera called Equifax by phone on December 14, 2016, to dispute the hard inquiry. (*Id.* p. 24:21-23.) After nothing was done in response[1], Rivera then submitted to Equifax three separate online disputes of the Hughes Cable inquiry on February 15, 2017, on March 28, 2017, and on July 11, 2017. (*Id.* p. 24:24-25:1; Deposition of Celestina Gobin ("Gobin Dep."), Doc. 76-3 pp. 60:1-4; 62:22-25; 75-3-9.) Also on July 11, Rivera called Equifax again to dispute the Hughes Cable inquiry. (Gobin Dep. p. 68:20; 70:4-13.) On this call, Rivera explained to an Equifax agent that he tried to dispute the specific Hughes Cable inquiry "multiple times," and stated:

> [T]here's something here that says . . . that a company named Hughes Network Systems, or something like that, did a hard inquiry on my report, or pulled my credit, but I never gave them permission to do that.

---

[1] In reference to the first call, the Equifax agent added a fraud alert to Rivera's file. (Gobin Dep. p. 41:14-15.) The agent did not indicate that Rivera was disputing the Hughes Cable hard inquiry as "unauthorized" or "not mine," as occurred numerous times thereafter. (*Id.* p. 42:1-3.)

(Transcript of July 11, 2017 Rivera-Equifax Call, Doc. 75-6 p. 4:8-12.) The Equifax representative asked Rivera whether he had contacted Hughes Cable directly. (*Id.* p. 5:2.) He had. Indeed, Rivera had called Hughes Cable numerous times to ask why it had pulled his credit report. (Rivera Dep. p. 25:25; 30:7-9.) However, Hughes Cable sent Rivera back to Equifax, stating that Equifax was the only entity that could remove the hard inquiry from his file. (*Id.* p. 26:3-5.) Rivera was adamant that the hard inquiry be removed because its existence in his credit file had lowered his credit score. (*Id.* p. 13:19-20.)  In this connection, Plaintiff has presented expert evidence that inaccurate hard inquiries harm consumers because they lower credit scores, misrepresent credit histories, and can be a reason credit is denied. (*See* Expert Report of Evan Hendricks, Doc. 75-11 at 1-2, 8, 10). *See also Steed v. Equifax Info. Srvcs., LLC*, 2016 WL 7888039 at *3-4 (N.D. Ga. Aug. 31, 2016) (explaining that Equifax itself admitted that unauthorized credit inquiries can misstate a consumer's credit history because they can wrongly lead someone reading the credit report to believe that the consumer sought credit, and also explaining that "[c]onsumer's credit scores are negatively impacted by fraudulent or inaccurate credit inquiries, and creditors are provided with an inaccurate portrait of the consumer's credit history. The only entity that benefits is Equifax, which does not have to expend resources reinvestigating disputed credit inquiries"); Equifax "Knowledge Center," Understanding Hard Inquiries on Your Credit Report (noting that "[h]ard

inquiries usually impact credit scores" and "may be meaningful to a potential lender when assessing your creditworthiness").[2]

After disputing the Hughes Cable hard inquiry notation with Equifax both online and by phone on numerous occasions, Rivera, on July 20, 2017, wrote a letter to Equifax disputing the same Hughes Cable inquiry. (Rivera Letter Dispute, Doc. 75-7.) In the letter, Rivera explains:

> Dear Sir or Madam:
>
> I am writing to dispute the following information in my file. Hughes Network Systems pulled my credit without my written consent on 11-17-17.
>
> This hard inquiry by Hughes Network Systems was placed on my Equifax Credit Report on 11-17-16. Hughes Network Systems did not have my permission to pull my credit and now this unauthorized hard inquiry is affecting my credit score. I have explained this matter to multiple representatives from your company on the following dates and have been sent the following respective confirmation numbers: 12/14/16 (6349016806), 2/15/17 (7046016596), 3/28/17 (7087074560), and 7/11/17 (7192045553).
>
> I have been told repeatedly to contact Hughes Network Systems and have them correct or update the information in my file. They cannot do so because I'm not in their system as I was never a customer of theirs. Hughes Network Systems is an internet company based in Maryland. I have had Comcast Cable for over ten years now and I repeat, I never authorized this hard inquiry.
>
> I am requesting the item be removed to correct the information within thirty days or I'll contact the Connecticut State Attorney General George Jepsen and the Consumer Financial Protection Bureau. Please reinvestigate this matter and correct the disputed item as soon as possible.

(*Id.*)

In response to Rivera's online, phone, and letter disputes, Equifax did not contact Hughes Cable, Rivera, or any other entity to determine whether Hughes Cable had ever obtained authorization to pull Rivera's credit report. (Gobin Dep.

---

[2] Available at: https://www.equifax.com/personal/education/credit/report/understanding-hard-inquiries-on-your-credit-report/ (last visited March 29, 2022).

p. 49:16-50:3; 72:4-11; 79:5-7.) As relevant to the allegations in this litigation—which concern only individuals who sent Equifax letters in the mail, not those who submitted only online disputes—Equifax replied to Rivera's mail letter with its standard "Cons Comm 664" form response letter. (*Id.* p. 81:2-6.)[3] The relevant Cons Comm 664 boilerplate response, in relevant part, stated that: "We have reviewed the inquiry information for Hughes Network Systems. The results are: Inquires are a factual record of file access. If you believe this was unauthorized, please contact the creditor. . . ."

| **Results Of Your Investigation** | *(For your security, the last 4 digits of your credit account number(s) have been replaced by *)* |
|---|---|

**>>> We have reviewed the inquiry information for Hughes Network Systems. The results are:** Inquiries are a factual record of file access. If you believe this was unauthorized, please contact the creditor. If you have additional questions about this item please contact: **Hughes Network Systems, 11717 Exploration Ln, Vpn #1, Germantown, MD 20876-2711**

(*See* Cons Comm Response, Doc. 76-4 at 5.) Volleyed back and forth between Equifax and Hughes Cable, Rivera was left with no answer as to how to get the unauthorized hard inquiry notation deleted from his credit report.

**Class Members' Disputes**

Rivera's experience was not unique; it was typical. In responding to his situation and complaints, Equifax representatives and systems worked according to plan and "in keeping with [Equifax's] policy." (Gobin Dep. p. 81:15; 75:19-21; 52:12-14.) Other consumers had the same experience as Rivera.

---

[3] Equifax also sent Rivera the Cons Comm 664 response to Rivera's online inquiry. (*Id.* p. 76:18-19.) As Equifax's representative affirmed, all of Rivera's disputes concerning the Hughes Cable inquiry—whether by phone, online, or in writing—the response was the same Cons Comm 664 response that "inquiries are a factual record" of file access. (*Id.* p. 81:9-15.)

Class discovery revealed that, during the relevant time period beginning on October 1, 2016, Equifax received over 330,000 mailed letters from consumers disputing hard inquiry notations in their credit files and that Equifax catalogued these letters as either "not mine" or "unauthorized" hard inquiry disputes. (Third Supplemental Discovery Responses, Doc. 76-10 at ECF 5; see also Examples of Dispute Letters, Doc. 76-7.)[4] Some of these disputing consumers even included documentation that they had obtained from the data inquirer, confirming that the credit inquiry was requested "in error." For example, one putative class member wrote to Equifax, stating: "Navy Federal Credit Union pulled my credit report multiple times without my consent" and included an accompanying letter from Navy Federal Credit Union, written to the consumer himself, stating that "due to clerical errors, inquiries on your Equifax and TransUnion credit reports were erroneously initiated by Navy Federal Credit Union." (*See* Citron Letter and Attachments, Doc. 76-7 at ECF 38-39). Other putative class members similarly wrote letters to Equifax requesting that an unauthorized hard inquiry be removed from their credit file. (*See* Holman Letter, Doc. 76-7 at ECF 58) ("This letter serves as a formal request to have the following unauthorized inquiries promptly removed from my Equifax credit file . . ."); (*see id.* at ECF 61) ("please remove the

---

[4] Other evidence suggests that this number may be higher. (See Declaration of Jordan M. Sartell ("Sartell Decl."), Doc. 76-6 ¶ 1) (noting that, in discovery, Equifax produced approximately 350,000 letters from consumers disputing one or more hard inquiry notations in their Equifax credit files).

mentioned inquiries made by Citi Mortgage ASAP. Since it affect[s] my score. Please consider this matter is <u>very important</u>.").

Equifax did not contact the data inquirers with respect to any of these disputes. Indeed, Equifax's stated policy is that it "does not contact the data inquirer in response to a dispute of a hard inquiry if it is the only dispute with that inquirer" because Equifax believes it is not required to do so under the FCRA. (Response to First Set of Interrogatories, Doc. 76-8 at ECF 10, 13, responses to Rog Nos. 7, 11.) Instead, Equifax sent all ~330,000 disputers a form letter that included the Cons Comm 644 response stating that "[i]nquires are a factual record of file access . . . ." (Third Supplemental Discovery Responses, Doc. 76-10 at ECF 5.) This is the same response letter that Rivera received. This boilerplate response is provided to disputing consumers pursuant to Equifax standard policies and procedures. (*See, e.g*., Equifax Training and Customer Service Workbook, Doc. 76-5 at ECF 16) (in reference to mail letters disputing hard inquiries, directing customer service representatives to provide the Cons Comm 664 response to the consumer and to tag the dispute as "not his/hers" and also detailing the same mode of handling for disputes raised via telephone).

Discovery also disclosed that many consumer letters disputing unauthorized hard inquiry notations involve the same third-party data inquirers. For example, a search of the consumer dispute letters at issue revealed that nearly 800 consumer disputes involve Hughes Cable, the same entity that requested and obtained Rivera's credit file without his consent. (Sartell Decl. ¶ 3.)

Accordingly, Plaintiff asks the Court to certify following class of persons:

> During the period beginning two years prior to the filing of this action and through the time of class notice, all persons residing in the U.S. and its Territories to whom Equifax sent a document containing Cons Comm 664 (i.e., a statement that "inquiries are a factual record of file access") in response to a written dispute of one or more hard inquiries.

(Motion to Certify, Doc. 76-1 at 5.)[5]

## Procedural Background

Plaintiff initiated this action on October 4, 2018. (Doc. 1.) Upon Answering (Doc. 15), Equifax filed a Motion to Deny Class Certification (Doc. 16). Magistrate Judge Bly recommended the denial of Equifax's Motion. (Non-Final R&R, Doc. 30.) No objections were filed and the Court adopted the R&R. (Doc. 32.) The parties then proceeded with class discovery but agreed to defer merits discovery until after the Court ruled on Plaintiff's anticipated motion for class certification. (Scheduling Order, Doc. 38.) Subsequently, in September of 2020, Plaintiff filed a Motion to Certify Class. (Doc. 75.) After full briefing, the Magistrate Judge issued a Report and Recommendation recommending that Plaintiff's Motion to Certify Class be denied. (R&R, Doc. 98.) Specifically, the Magistrate Judge found that common issues did not predominate because he reasoned that (1) each class member would be required to show that the hard inquiry notation he or she challenged was inaccurate and (2) this showing would require individualized

---

[5] This is the same class definition that was certified in the carbon-copy case against TransUnion filed in the Eastern District of Pennsylvania. *See Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98 (E.D. Pa. 2020), *leave to appeal denied*, 2020 WL 6393900 (3d Cir. Sept. 15, 2020).

inquiry. (*Id.*)[6] In so finding, the Magistrate Judge relied in large part on the Eleventh Circuit's decision in *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1155 (11th Cir. 1991), reading that decision to require a plaintiff in a § 1681i case to present upfront documentary evidence of inaccuracy to trigger the FCRA statutory duty to reinvestigate. The Court explains below why this finding was erroneous as applied.

Plaintiff filed serious objections to this finding and recommendation, arguing that the Magistrate Judge discounted Plaintiff's proffered common evidence that could be used to show that the hard inquiry notation each class member challenged was in fact not authorized and was therefore inaccurate, under Plaintiff's theory. (Doc. 101.) Plaintiff's objections have now been fully briefed. (Docs. 105, 106.) After reviewing the briefing, the Court held a hearing on November 23, 2021 to hear further argument from counsel regarding the issues raised in Plaintiff's objections and Defendant's response as well as more broadly in connection with Plaintiff's Motion for Class Certification.

Accordingly, after comprehensive briefing supplemented by oral argument, the issues raised in Plaintiff's Motion and his objections are ripe for review.

---

[6] On the other hand, the Magistrate Judge found that the question of whether Equifax's conduct was a willful violation of 15 U.S.C. § 1681i(a) could be properly answered on a class-wide basis given the record in this case. (R&R, Doc. 98 at 26.) In this connection, the Magistrate Judge pointed out that Plaintiff had "provided evidence that Defendant's policy of not reinvestigating or deleting disputed inquires and merely sending a form response was a 'standard operating procedure' that Equifax applied uniformly." *Id.*

## II. LEGAL STANDARD

After conducting a careful and complete review of a magistrate judge's findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1)(C). The Court reviews any portion of the R&R that is the subject of a proper objection on a *de novo* basis and any non-objected portion for plain error. 28 U.S.C. § 636(b)(1)(C); *Furcon v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1308 (11th Cir. 2016). A district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. Of Educ. Of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990). Further, a district judge retains "ultimate adjudicatory power over dispositive motions" and the "widest discretion" over how to treat a report and recommendation. *Gonzales v. United States*, 981 F.3d 845, 851 (11th Cir. 2020) (citing *Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009)).

In light of Plaintiff's objections, the Court has reviewed the original Motion to Certify Class, the R&R, the objections, all briefing, and the full record *de novo*. In evaluating Plaintiff's Motion, the Court applies the standard for class certification under Federal Rule of Civil Procedure 23, which provides that one or more members of a class of litigants may sue on behalf of the class's members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four requirements are "commonly referred to as 'numerosity, commonality, typicality, and adequacy of representation.'" *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003) (citation omitted). "A class action 'may only be certified if the trial court is satisfied, after a rigorous analysis, that the[se] prerequisites of Rule 23(a) have been satisfied.'" *Sellers v. Rushmore Loan Mgmt. Services, LLC*, 941 F.3d 1031, 1039 (11th Cir. 2019) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

"In addition to meeting these requirements, the plaintiff must show that the proposed class satisfies at least one of the class types under Rule 23(b)." *Sellers,* 941 F.3d at 1039. Here, Plaintiff seeks class certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). In conducting this inquiry, a court should "give careful scrutiny to the

relation between common and individual questions in a case." *Bouaphakeo*, 577 U.S. at 454. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Id*. (internal citation omitted). The crux of the analysis is "whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id*.

Where, after adjudication of class-wide issues, "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims," certification is not appropriate. *Sellers*, 941 F.3d at 1040 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639 (2008)). On the other hand, when one or more central issues are "common to the class and can be said to predominate, the action" is a proper class under Rule 23(b)(3), even where "other important matters" such as "damages or some affirmative defenses peculiar to some individual class members" will have to be tried separately. *Bouaphakeo*, 577 U.S. at 454 (citations omitted).

## III. DISCUSSION

### A. Rule 23(a) Requirements

In his initial Motion to Certify Class, Plaintiff argued that the proposed class meets the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation. In response, Equifax challenged only that Plaintiff could not meet the commonality requirement.

Plaintiff proposes that two common questions animate this case: (1) whether Equifax's uniform practice of failing to either reinvestigate or delete consumer disputes of hard inquiries violates 15 U.S.C. § 1681i(a); and (2) whether the violation was willful. In the R&R, the Magistrate Judge found that the second question was a common question and that therefore the commonality requirement was satisfied. (R&R at 26) (citing *Sellers*, 941 F.3d at 1040) (explaining that "[f]or the commonality requirement, even a single common question will do") (internal citation omitted)). Equifax does not object to this conclusion. Having found no error, the Court adopts this finding, as well as the R&R's findings that the other Rule 23(a) requirements are met.

Although the Magistrate Judge found that Plaintiff's proposed second question—as to willfulness—was a common question, he determined that Plaintiff's first proposed question was individualized rather than common. Rivera objects to this conclusion. As this discussion merges with the key issue of predominance, the Court addresses this objection below. For now, the Court reiterates that Plaintiff has established that the proposed class is sufficiently

numerous, that there is at least one common question, that his claim is typical of the class, and that he is an adequate representative.

## B. Rule 23(b)(3)'s Predominance Requirement

### i. A Showing of "Inaccuracy"

As noted above, in assessing whether a plaintiff has demonstrated that common questions predominate, a court should distinguish between individual questions, for which evidence varies from member to member, versus common questions, for which "the same evidence will suffice for each member" or "the issue is susceptible to generalized, class-wide proof." *Bouaphakeo*, 577 U.S. at 454. The guiding question is "whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.*

Here, Plaintiff frames the animating question in this case as follows: does Equifax's uniform practice of failing to either reinvestigate or to delete consumer disputed hard inquiries violate 15 U.S.C. § 1681i(a)? Plaintiff argues that this is a common question, subject to class-wide proof. Equifax contends that this is an individualized question because, to prevail, each class member is required to show that the information he challenges—here, the "hard inquiry" notation on his report—is "inaccurate." Plaintiff does not dispute that each class member is required ultimately to make a showing that the hard inquiry he disputed was

"inaccurate;" rather, Plaintiff argues that he has shown that the question of "inaccuracy" is subject to class-wide proof in these special circumstances.[7]

Before turning to the text of the statute, it is important to clarify the nature of the "inaccuracy" dispute currently before the Court. The question of whether a notation of an unauthorized hard inquiry (e.g., the notation on Rivera's credit report that Hughes Cable sought and obtained his credit report when he did not apply for credit with Hughes Cable) is sufficient to constitute an "inaccuracy" under the FCRA is not presently before the Court. This merits question—arguably one of the most important questions in this case—applies commonly to all putative class members. Merits issues should not be addressed at the certification stage. *Amgen Inc. v. Connecticut Requitement Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013).

For now, the Court notes that the Eleventh Circuit has held, under § 1681e, that an item on a credit report is "inaccurate" where it is factually incorrect or also where it is "factually correct but nonetheless misleads its users as to its meaning or implication." *Erickson v. First Advantage Background Services Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020). This understanding finds support in other circuits as well. *See Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895-96 (5th Cir. 1998) (finding that a credit entry may be "inaccurate" under §

---

[7] In briefing, Equifax attacks Plaintiff's position through asserting an erroneous postulate of Plaintiff's contentions in this case: Equifax represents that it is Plaintiff's position that the class members are not required to show inaccuracy. (Resp. to Obj., Doc. 105 at 2.) But that is not Plaintiff's position. Rather, Plaintiff argues that he can demonstrate inaccuracy on a class-wide basis. (Obj. Reply, Doc. 106 at 7.)

1681e where it is "patently incorrect" or also when it is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions"); *Dalton v. Cap. Assoc. Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001) (holding that "[a] report is inaccurate when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect") (internal citations omitted); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C. Cir. 1984) (holding that the FCRA protects against, not only "technically untrue" information but also against "factually correct information that nonetheless mislead their readers" in credit reports).[8] At least one district court within the Eleventh Circuit has also addressed this issue, specifically as to the information at issue in this case, hard inquiries. *See Steed v. Equifax Info. Servs.*, 2016 WL 7888039, at *4 (N.D. Ga. Aug. 31, 2016) (Jones, J.) (finding that "hard inquiries" that are not authorized are "inaccurate" under § 1681i because they misstate consumers' credit histories).[9] In this case, the parties chose to

---

[8] *See also Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 756 (9th Cir. 2018) (explaining that, an "item of information" under § 1681i, like one under § 1681s-2(b), is "inaccurate" if it "patently incorrect" or if it is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions"); *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010) (same).

[9] While the *Steed* Court found that unauthorized hard inquiries constituted "inaccuracies" under the statute, it granted summary judgment to Equifax because the plaintiff failed to establish that the violation was knowing or reckless. *See id.* at *4 (noting that the plaintiffs were required to show that Equifax's interpretation was objectively unreasonable in light of authoritative guidance, and, "[n]one of the cases cited by Plaintiffs have addressed the issue of whether credit inquiries are 'information contained in a consumer's credit file'. . .."). In the present case, the Magistrate Judge found that willfulness was a common question and Equifax has not objected to that finding. Because the parties bifurcated class and merits discovery, they have not addressed the issue of willfulness on the merits. However, the Court expects that Plaintiff will argue *inter alia* that, this time around, he can establish that the alleged statutory violations were knowing and reckless where a court in a past case—specifically *Steed*—held that unauthorized hard

bifurcate class and merits discovery, and therefore have not yet briefed the issue of whether unauthorized hard inquiries are misleading in such a way as to adversely affect credit decisions. While the Court therefore discusses it no further at this juncture, it reiterates that the ultimate assessment on this issue is the same for all class members.

Rather, the question presently before the Court is whether each putative class member is required to establish that the item of information they disputed—the hard inquiry notation—was "inaccurate" (i.e., misleading because they never sought credit with the data inquirer, under Plaintiff's theory), and, if so, whether that can be established on a class-wide basis. With that framing, the Court turns to the text of the statute. In assessing the operative provisions of the FCRA, the Court is mindful that interpretation of any statute must begin with the plain meaning of the words used because courts "must presume that Congress said what it meant and meant what it said." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001).

Section 1681i of the FCRA specifically addresses a consumer reporting agency's duty in response to a customer's dispute to the "completeness or accuracy" of an "item of information" in his credit file. This subsection thus outlines the "Procedure in case of disputed accuracy," as follows:

(a)     Reinvestigations of disputed information

---

inquiries were inaccurate items of information that a credit reporting agency is required to reinvestigate.

**(1)    Reinvestigation required**

(A)    In general

Subject to subsection (f) and except as provided in subsection (g), **if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such a dispute, the agency *shall*, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file** in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C. § 1681i (emphases added).

Accordingly, under the plain text of the statute, upon receiving a consumer dispute to the "completeness or accuracy" of an "item of information,"—here, a hard inquiry notation—Equifax "shall" conduct a "reasonable reinvestigation" to determine whether the hard inquiry notation is inaccurate and then record the status of the disputed information, or alternatively delete the hard inquiry notation. *Id.*

The statute outlines what a reinvestigation entails, explaining: within 5 business days of receiving notice of the consumer's dispute, Equifax "shall provide notification of the dispute to any person who provided any item of information in dispute." *Id.* § 1681i(a)(2). Then, the agency must determine whether information is "inaccurate, incomplete, or cannot be verified." If so, it shall "promptly delete" that item of information or modify the file as appropriate

and notify the furnisher of the information that it has been deleted or modified. *Id*. § 1681i(a)(5)(A).

The statute also allows a credit reporting agency to terminate a reinvestigation if it "reasonably determines that the dispute by the consumer is frivolous or irrelevant." But, under such circumstances, the credit reporting agency is required to notify the consumer of the frivolous/irrelevancy determination within 5 days of making the determination. *Id*. § 1681i(a)(3)(B). Here, there is no evidence that Equifax considered Rivera's or any other class members' disputes frivolous or irrelevant. (*See* Gobin Dep., Doc. 76-3 p. 101:9-21) (agreeing that "we did not consider [Rivera's] concerns frivolous. They were addressed each and every time.").

Besides § 1681i's reasonable reinvestigation provision, other subsections of the FCRA impose requirements on credit reporting agencies to ensure accurate reporting of consumer information. A related provision, § 1681e, requires a consumer reporting agency, in *initially preparing* a consumer's credit report, to "follow reasonable procedures to assure maximum possible accuracy." 15 U.S.C. § 1681e(b). This provision is not at issue in this case. However, cases involving § 1681i claims often also involve § 1681e claims, as consumers often challenge a credit reporting agency's compliance with both requirements, related to "reasonable procedures" in the initial preparation of the credit report (under § 1681e) and the "reasonable reinvestigation" in the event of a disputed item (under § 1681i).

In discussing these two different but related statutory provisions, the Eleventh Circuit has adopted the reasoning of other circuits, explaining that there are key distinctions between § 1681i and 1681e claims related to the "very different position" a credit reporting agency is in when initially compiling a credit report versus after it has been notified of a possible inaccuracy:

> Because "lenders report many millions of accounts to Experian daily," requiring it to examine each report individually for errors would be unduly costly. *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004). But on the flip side of the same coin, when a "credit reporting agency ... has been notified of potentially inaccurate information in a consumer's credit report[,] [it] is in a very different position than one who has no such notice." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 286-87 (7th Cir. 1994). That's because "once a claimed inaccuracy is pinpointed, a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). We think those principles make good sense, and we now adopt them.

*Losch v. Nationstar Mortgage LLC*, 995 F.3d 937, 945-946 (11th Cir. 2021) (explaining that, once the plaintiff informed Experian of the inaccuracy, Experian "only **had to** investigate that single, **alleged** error" and was therefore in a "very different position" than before plaintiff contacted it) (emphases added); *see also Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1334-35 (11th Cir. 2015) (explaining that § 1681i(a) "imposes on a consumer reporting agency the duty of conducting a reasonable reinvestigation of **disputed** information in a consumer's credit file" and that an agency "violates that provision" if a consumer notifies it of inaccurate information and the agency does not reinvestigate) (emphasis added). *See also Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942

F.3d 1200, 1212 (11th Cir. 2019) (interpreting furnisher's duty to reinvestigate disputed item of information under parallel statutory provision, § 1681s-2(b)(1)(A), and holding that plaintiff met all four requirements to state a claim for failure to reinvestigate where he adequately alleged that (1) he disputed the accuracy of an item of information on his credit report; (2) the furnisher received notice of the dispute; (3) the furnisher failed to investigate; and (4) the furnisher recklessly disregarded its duty to investigate); *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1304 (11th Cir. 2016) (explaining that the two reinvestigation provisions—§ 1681s for furnishers and § 1681i for credit reporting agencies—have a "parallel structure" with coterminous boundaries, and relying on statutory text in § 1681i in evaluating claims brought under § 1681s).[10]

Like the *Losch* Court, the Pennsylvania district court in the parallel case against TransUnion also relied on *Cushman* and *Henson* to explain this important distinction related to the consumer reporting agency's statutory duty to reinvestigate after being alerted to a "claimed inaccuracy":

> [Various courts] have suggested that "the costs" of requiring an agency to adopt overly strict procedures at the outset would "outweigh any potential benefits of such [] requirement[s]." *Cushman*, 115 F.3d at 225; *see also Henson*, 29 F.3d 280 (noting that overly strict frontend precautionary rules "would also require credit reporting agencies to engage in background research which would substantially increase the cost of their services," which "they would be forced to pass on ... to their customers and ultimately to the individual consumer").

---

[10] Other circuits have similarly interpreted the two reinvestigation provisions consistently in light of the parallel structure. *See Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014); *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 432-33 (4th Cir. 2004).

The cost-benefit calculus flips, however, once a consumer pinpoints a claimed inaccuracy . . . . The flipping of the cost-benefit calculus when an agency moves from § 1681e procedures to a § 1681i reinvestigation is best understood as a shifting of the investigatory burden from the consumer to the agency. Following *Cushman*'s cost-benefit framework, under § 1681e, agencies are not required to design procedures that prevent the appearance of all conceivable inaccuracies . . . .

The burden of reinvestigation, however, lies with the agency. *Cushman*, 115 F.3d at 225; *Henson*, 29 F.3d at 286-87 ("A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice….[because once] a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation."); *Stevenson v. TRW, Inc.*, 987 F.2d 288, 291 (5th Cir, 1993) (noting that "[t]he statute places the burden of [re]investigation squarely on" the consumer reporting agency").

*Norma*n, 479 F. Supp. 3d 98, 120 (E.D. Pa. 2020) (granting motion to certify similar class of persons in case against TransUnion), *leave to appeal denied*, 2020 WL 6393900 (3d Cir. Sept. 15, 2020).

A careful review of *Losch*, and the Eleventh Circuit's intentional decision there to adopt the principles of other circuits (including expressly the Third Circuit's analysis in *Cushman*), makes clear that a plaintiff bringing a § 1681i reinvestigation claim is not required to present documentary proof of inaccuracy upfront in order to trigger reinvestigation under the statute. Rather, upon being alerted to an "*alleged* error," for example, in Rivera's credit report, Equifax "*had to* investigate." *Losch*, 995 F.3d at 945-946 (emphasis added). Indeed, requiring a plaintiff (like Rivera) to provide documentary proof of inaccuracy in order to

trigger reinvestigation would be reading a requirement into the statute that is not present. Section 1681i plainly states that: "if the completeness or accuracy of any item of information" in a consumer's file "*is disputed* by the consumer and the consumer notifies the agency directly . . . the agency *shall*, free of charge, conduct a reasonable reinvestigation *to determine whether the disputed information is inaccurate*." 15 U.S.C. § 1681i (emphases added). If the Court were to require putative class members to provide additional proof upfront to trigger reinvestigation under the statute, the Court would be, in effect, impermissibly altering the language of the statute "contrary to its plain and unambiguous meaning." *See CBS*, 245 F.3d at 1228 ("[C]ourts have no authority to alter statutory language.... We cannot add to the terms of [the] provision what Congress left out.") (citing *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1187 (11th Cir. 1997)).

The *Norman* Court similarly explained as much in the twin case against TransUnion. In that case, the Court reasoned that to require the consumer to provide upfront additional proof of inaccuracy, *beyond* presentation of the consumer's dispute letter, that the hard inquiry had *not* in fact been authorized would be inconsistent with TransUnion's duty to reinvestigate under the statute. *Norman*, 479 F.Supp.3d at 123. "[T]he statute provides that the duty to reinvestigate lies with the reporting agency" because "[g]ranting the agency the freedom to decline to conduct any reinvestigation after a consumer has lodged an

appropriate dispute would frustrate the purpose of the reinvestigation requirement" and contravene the plain statutory text. *Id.*

In the R&R below, however, the Magistrate Judge discounted this rationale. In particular, the R&R discounted the *Norman* Court's reasoning as unpersuasive because it was based on Third Circuit law, notably *Cushman*, which he read as inconsistent with Eleventh Circuit precedent. (*See* R&R at 18.) However, a close reading of *Losch* demonstrates that this is not the case. Rather, the *Losch* Court, in 2021, specifically adopted the principles articulated in *Cushman*—the same principles the *Norman* Court relied on and that the Magistrate Judge discounted below. As a result, the R&R effectively held that the class members had to provide additional documentary proof of inaccuracy upfront to trigger Equifax's duty to reinvestigate. In doing so, the Magistrate Judge impermissibly read a requirement into the statute that is not present, and therefore erred.

This error was based on an overbroad interpretation of the Eleventh Circuit's decision in *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1155 (11th Cir. 1991). As will be discussed momentarily, in *Cahlin*, the credit reporting agency undisputedly conducted a reinvestigation involving back and forth information exchanges between the consumer, the information furnisher, and the consumer reporting agency. The *Cahlin* decision did not speak to a situation where the reporting investigation conducted no reinvestigation at all.

While *Cahlin* thus does not require a plaintiff asserting a § 1681i claim to present affirmative documentary evidence of inaccuracy upfront to trigger a reporting agency's duty to reinvestigate, as the R&R held, it is plain that both *Cahlin* and *Losch* do require a plaintiff asserting a failure to reinvestigate claim under § 1681i to make some showing of an inaccuracy. Indeed, a plaintiff cannot recover if the information he challenges is not inaccurate. *Id.*; *Losch*, 995 F.3d at 944 ("to state a claim under § 1681e, the plaintiff must show that the agency's report contained factually inaccurate information, that the procedures it took in preparing and distributing the report weren't 'reasonable,' and that damages followed as a result . . . . The elements of a claim under § 1681i . . . are the same, except the plaintiff needn't show that the agency prepared and distributed the report.").[11] Although the parties do not discuss the rationale behind this requirement, the reasoning makes sense: if the challenged information is not inaccurate, a consumer's Article III injury is not "fairly traceable" to the reporting agency's failure to reasonably reinvestigate, as required by the statute.

For example, in *Cordoba v. DIRECTTV, LLC*, the Eleventh Circuit addressed class certification in connection with the Telephone Consumer Protection Act and explained that, where an individual did not sign up for the National Do Not Call Registry, the injury of unwanted calls was not "fairly

---

[11] In *Losch*, 995 F.3d at 944, the Eleventh Circuit also explained that a § 1681i claim focuses on a consumer's credit "file" rather than his credit "report" but noted that, in that case, the consumer disputed information on his credit "report," so the distinction was "immaterial." Here, the consumers dispute hard inquiries on their credit reports, so the distinction is also immaterial.

traceable" to the defendant's statutory violation of the TCPA in failing to maintain an internal do-not-call list. 942 F.3d 1259, 1271 (11th Cir. 2019) ("[I]f an individual not on the National Do Not Call Registry was called by [defendant] and never asked [defendant] not to call them again, it doesn't make any difference that [defendant] hadn't maintained an internal do-not-call list. [Defendant] could and would have continued to call them even if it had meticulously followed the TCPA and the FCC."). Thus, in such circumstances, where an injury is not "fairly traceable" to the statutory violation, an individual lacks Article III standing. *Id*. at 1272.

A close review of *Cahlin* illustrates this point well. In *Cahlin*, a plaintiff brought claims under both § 1681e and § 1681i in connection with a charged-off debt to GM listed in his credit report. *See* 936 F.2d 1151, 1155 (11th Cir. 1991). Specifically as to the § 1681i claim, the plaintiff (Cahlin) disputed the credit reporting agency's (CBI) listing of an "I9 rating," signifying a charged-off debt, on his credit report. In his dispute letter, Cahlin told CBI that he had paid off the debt. In response to Cahlin's dispute, CBI conducted an investigation whereby it contacted GM (the creditor) and corresponded with Cahlin (unlike here). *Id*. at 1155. After its initial reinvestigation, CBI changed the rating to an "I-1 rating," signifying a debt that was paid within 30 days, and then moved the "I9 rating" to the "previous credit history" section of Cahlin's report. *Id*. Eventually, GM (the creditor)—after corresponding with Cahlin—asked CBI to delete the "I9 rating"

entirely to avoid any litigation with Cahlin, and CBI did delete the I9 reference. *Id.*

Upon review, the Eleventh Circuit held that Cahlin's § 1681i reasonable reinvestigation claim against CBI failed because the information he challenged—the "I9 rating" in his previous credit history section—was not inaccurate because Cahlin's debt with GM had been charged off and later settled, all of which was accurately reflected on his credit report as determined by CBI's reinvestigation. *Id.* at 1160. (noting that a § 1681i claim "is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entity"). Accordingly, no additional reinvestigation "would have revealed any 'inaccuracy' in [CBI's] reporting on the GM[] account because there was none." *Id.* Further,

> [Cahlin] argues that he should have been given a clean slate on his credit report after he settled the debt with GM[]'s collection attorney. **A consumer, however, cannot bring a [§ 1681i] claim against a credit reporting agency when it exercises its independent professional judgment, based on full information, as to how a particular account should be reported on a credit report**. In this case, CBI initially reported that the GM[] account was a charged off account with an outstanding balance and eventually acceded to GM[]'s directives that Cahlin's account be rehabilitated to avoid litigation. **No reasonable investigation on the part of CBI could have uncovered any inaccuracy in Cahlin's report because there was never any factual deficiency in the report.** As we noted earlier, GM[]'s representatives testified that CBI's reporting of Cahlin's account was accurate as of August, 1986 and that the same reporting would continue to be accurate today.

*Id.* at 1160 (emphasis added). The *Cahlin* Court thus did not hold that a plaintiff asserting a § 1681i claim has to irrefutably prove upfront that the information challenged is inaccurate—just that a plaintiff cannot ultimately recover where the reinvestigation has shown that information is in fact accurate.

As with the discussion in *Cordoba* related to the TCPA, where the defendant's compliance with the statute would not have prevented the plaintiff's harm, Cahlin's injury was not caused by any asserted statutory violation. *See also TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2205 (2021) ("For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm *because of* the defendant's violation of federal law.") (emphasis added).

Applying these principles to the present case, it follows that *if there were* putative class members who did not challenge "inaccurate" hard inquiry notations on their credit report, and instead challenged "accurate" hard inquiry notations, those putative class members would not ultimately be able to make out a § 1681i claim. This is because their injury—the harmful information on their reports—would not be traceable to Equifax's failure to reinvestigate in response to their dispute letters since, after conducting a reinvestigation and obtaining "full information," Equifax would have no obligation under the FCRA to delete the hard inquiry notation. *Cahlin*, 936 F.2d at 1160.

With that statutory understanding, the Court now assesses the actual evidence proffered in support of the putative class members claims. As reasoned above, to recover statutory damages, each class member must ultimately show that the hard inquiry he challenged was inaccurate. *See Losch*, 995 F.3d at 944; *see also Bouaphakeo*, 577 U.S. at 1053 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.") (Roberts, J., concurring).

Plaintiff contends that he can and has established inaccuracy and traceability between the injury and conduct complained of by class-wide proof, and that the R&R erred by ignoring his proffered class evidence. Plaintiff bases this on several prongs of proof. First, Plaintiff contends this is demonstrated specifically through the ~330,000 letters mailed from putative class members disputing that a hard inquiry notation on their credit report was not authorized. (*See e.g.*, Rivera Letter Dispute, Doc. 75-7; Other Sample Dispute Letters, Doc. 76-7 at ECF 38-39, 58, 61.) Similarly, class-wide evidence was presented that Equifax received these letters and itself classified them as either "unauthorized" or "not mine" disputes of hard inquiries. (*See* Discovery Responses, Doc. 76-10 at ECF 5.) Further, Plaintiff provided evidence of Defendant's failure to initiate follow-up corrective inquiries. (Interrogatory Responses, Doc. 76-8 at ECF 10, 13, responses to Nos. 7, 11; Discovery Responses, Doc. 76-10 at ECF 5.) As Plaintiff argued at the November 23 hearing, each class members' word, as represented in

the letters, would be sufficient to carry the day on inaccuracy, if unrebutted at trial:

> Once the plaintiff states or communicates this inquiry is unauthorized, I did not apply for credit, they dispute it to Equifax, Equifax receives it, and then Equifax either doesn't reinvestigate or doesn't delete, that consumer's burden is done at least initially . . . Now it is up to Equifax to come in and say, hey, we called Hughes Cable and they said it is you. I have a credit application with your signature on it . . . .
>
> [This evidence] would carry the burden of proof at trial for an individual case. A plaintiff's own testimony or a plaintiff's own assertion that this is inaccurate, I never applied for credit, that would be enough.

(*See* Nov. 23 Hearing Tr., Doc. 111 p. 9:13-21; 12:3-6.)

The Court agrees that the letters constitute an initial probative showing that the challenged hard inquiries were inaccurate under Plaintiff's theory. Whether Plaintiff chooses to present this evidence in some other manner—for example, through a statistical or representative breakdown, *see Bouaphako*, 577 U.S. at 463[12], or by requiring class members to submit claim forms attesting that they did not give authorization for the hard inquiries they challenged—is an issue that may be further developed and addressed at a later time. At this stage, however, the large volume of letters indicate that Plaintiff can establish class-wide that members of the class did not seek credit from or give authorization to the third-party data inquirers to access their credit files. Therefore, Plaintiff is situated to establish on a class-wide basis that class members' harm is sufficiently

---

[12] Plaintiff indicated in briefing that, if appropriate, he can offer representative and statistical expert summaries of the letters. (Obj., Doc. 102-1 at n.11.)

traceable to Equifax's alleged failure to reinvestigate, consistent with its systematic practice, as required by § 1681i this particular category of complaints. *See Losch*, 995 F.3d at 945-946 (explaining that, once the plaintiff informed Experian of the inaccuracy, Experian "only **had to** investigate that single, **alleged** error" and was therefore in a "very different position" than before plaintiff contacted it). In so finding, the Court concludes that the Magistrate Judge did not give appropriate consideration and weight to Plaintiff's proposed class evidence and did not account for the fact that Equifax provided no credible evidence in response.

Indeed, under the circumstances, Equifax's contention that each class member's situation would have to be assessed separately to determine if it were true that he never applied for credit (with Hughes Cable, for example) does not hold water. Equifax has not produced evidence of a single instance in which a putative class member disputed a hard inquiry that he had actually authorized or from an entity that he had sought credit from. Moreover, Plaintiff *specifically requested* this information from Equifax in discovery on multiple occasions. (See Second Responses to RPDs, Doc. 91-1 at ECF 6-7, Request 34.) Plaintiff asked Equifax to identify any of the letters that challenged authorized credit pulls because a consumer, in writing his letter, was for some reason mistaken. (*Id.*) In response, Equifax did not identify a single person or letter but instead stated as a defense its *standard policy position* as to all putative class members that "inquiries are an indication of the fact that a data inquirer has requested

information on a consumer . . . . Inquiries are, therefore, a necessarily accurate representation of the access that has been provided." (*Id*.)[13]

In briefing below before the Magistrate Judge, Equifax relied on the declaration of its Legal Support Leader, who stated generally that consumers "may" wrongly claim that an inquiry was unauthorized in instances where they: do not recognize the data inquirer who obtained their credit report; forget about accounts they've opened; do not understand that certain data inquirers—like utilities—can access their credit reports; or intentionally lie in efforts to improve their credit score. (Gobin Declaration, Doc. 87-4, ¶¶ 10-11.) But even considering these hypothetical scenarios, Equifax has offered no witness, no document, and no evidence of any kind that contradicts the actual class members' dispute letters stating that the relevant hard inquiries are unauthorized. Further, as noted above, it was *Equifax itself* that categorized the ~330,000 dispute letters at issue as "unauthorized."  And once again, Equifax was directly asked in discovery to point out any letters that it asserts were erroneously challenging authorized inquiries (for the hypothetical reasons cited by Ms. Gobin, for example) and declined to do so. Accordingly, Equifax has not shown that these conceivable situations apply to any putative class members or provided any information or

---

[13] The Court reiterates that the statute outlines the steps of a reinvestigation, specifically requiring that a reporting agency (1) provide notification of the dispute "to any person who provided information in dispute"; (2) determine whether the information is "inaccurate, incomplete, or cannot be verified"; and, if so, (3) "promptly delete or modify the file" as appropriate; and (4) notify the furnisher of information that the information has been deleted or modified. *See* § 1681i(a)(5)(A). Equifax's standard policy response clearly did not follow these steps or required processes.

evidence regarding whether these situations occur rarely or often. As a result, Equifax still has not provided concrete evidence that significant individualized inquiries will be required when reviewing future evidence in the case before the Court or, alternatively, that the hurdles of addressing any such individualized evidence (if it materializes) will be so cumbersome as to undermine the utility of addressing Plaintiff's claims here on a class-wide basis.

Thus, according to the comprehensive evidence that is before the Court, Plaintiffs have provided class-wide proof tending to show that: (1) each class member challenged an unauthorized hard inquiry (i.e., an "inaccurate" one, under Plaintiff's merits theory); (2) Equifax received those dispute letters and categorized them similarly; and (3) Defendant maintained a regular practice of not conducting investigations or implementing corrections in connection with consumers' complaints regarding reporting of inaccurate, unauthorized hard credit inquiries. There is no record evidence to the contrary. There is some irony in the fact that *the reason* there is no evidence to the contrary is because Equifax admittedly, and pursuant to its stated policy, *did not check* with the third-party data inquirers to determine whether those data inquirers in fact had obtained permission to access the credit reports for the disputing individuals. Instead, by making a policy choice not to check with the data inquirers, Equifax has, accepting Plaintiff's merits theory, shifted its statutory obligation to reinvestigate into the courts, forcing litigation surrounding the very questions it was mandated to determine itself. Put another way, Equifax attacks Plaintiff's class by arguing

that each class member must provide up-front absolute proof of the facts that Equifax itself was, according to Plaintiff's merits theory, duty-bound to investigate under the plain text of the statute. *See* § 1681i (stating that a credit reporting agency "shall" conduct a reasonable reinvestigation into the "completeness or accuracy" of disputed items of information); *Losch*, 995 F.3d at 945-946; *Collins*, 775 F.3d at 1334-35.[14]

As it stands, both sides agree that any hypothetical individuals who challenged hard inquiries that they actually authorized should not be in the class. However, there is no record evidence that any putative class member fits this mold so as to rebut Plaintiff's common evidence, i.e., consumer letters stating that the hard inquiries were unauthorized or "not mine." Equifax has not provided any hard, specific evidence that a large number of individuals mistakenly challenged hard inquiries by data inquirers that they had previously sought credit from. While it is reasonable to believe that some individuals were mistaken about whether they had previously sought credit and provided authorization to a third-party, the idea that a broad swath of class members—who

---

[14] The Court also notes that, practically speaking, how a consumer himself would show—by more than his own word, which is sufficient, as discussed above—that a third-party data inquirer did not have authorization to pull his credit report is not entirely clear. As Rivera's Kafkaesque situation demonstrates, Hughes Cable had no inclination to provide Rivera with any "evidence" that it pulled his credit report without authorization. Equifax, on the other hand, in conducting a reinvestigation, could have requested that Hughes Cable provide a document, such as a credit application, indicating Rivera's authorization. Indeed, even in the rare instance where a consumer was able to obtain a statement from the data inquirer acknowledging its "error," as the Court understands it, Equifax still did not delete the hard inquiry or further investigate. (*See, e.g.*, Citron Letter and Attachments, Doc. 76-7 at ECF 38-39) (attaching letter from Navy Federal Credit Union, acknowledging that credit inquiry was initiated "in error").

took the time to send letters protesting the authorization—were mistaken about the very issue they protested is not a reasonable inference at this stage of these proceedings. Rather, as noted above, a reasonable inference indicates the opposite: that the class members were properly complaining of an inquiry they did not authorize. This inference is bolstered by the record evidence that certain third-party data inquirers, like Hughes Cable, were the subject of a large numbers of unauthorized hard inquiries disputes and that Equifax never investigated such disputes, even in the face of such a pattern. In sum, Plaintiff has carried his burden at this stage to demonstrate to the Court that individualized inquiries will not predominate over the critical common questions in this case of whether unauthorized hard inquiries constitute "inaccuracies," how hard inquiries harm class members, whether Equifax's standard policy in response to hard inquiry dispute letters violates the § 1681i, and whether any violation was willful. *See Bouaphakeo*, 577 U.S. at 543 ("The predominance inquiry 'asks whether the common, aggregation-enabling, issues in this case are more prevalent or important than the non-common, aggregation defeating, individual issues.")

In *Cordoba*, discussed above, the Eleventh Circuit held that a district court errs when it does not conduct a pragmatic assessment of the issues involved to consider whether a considerable number of class members might not have standing to remain in the class. *Cordoba*, 942 F.3d at 1275-76 (approving of Seventh Circuit's reasoning that, *while a properly defined class will often include some uninjured class members*, a problem arises where it is apparent that

putative class "contains a great many persons" who have suffered no injury at the hands of the defendant") (emphasis added) (discussing *Kohen v. Pacific Investment Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009)); *see also*, *Bouaphakeo*, 577 U.S. at 1053) (Roberts, J., concurring) (noting that a class action may move forward where there are "some uninjured members in the class as currently defined.").

Here, the Court's pragmatic assessment is that, unlike in *Cordoba*, Plaintiff does have a viable mechanism for establishing inaccuracy (and traceability) through common class evidence. The common class letters, Equifax's cataloguing of these letters, and Equifax's common responses assuage concerns regarding an overbroad class definition or that a "great many persons," *Cordoba*, 942 F.3d at 1275-76, do not have an injury traceable to Equifax's alleged statutory violation. In contrast, Equifax's arguments about an overbroad class are based on speculation. And where the potential that some number of individuals mistakenly challenged authorized hard inquiries is hypothetical, courts should not allow such "speculation and surmise to tip the decisional scales" against class certification. *See Bridging Communities Inc. v. Top Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (citing *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000); *see also Huffman v. Prudential Ins. Co. of Am.*, 2018 WL 583046, at *6 (E.D. Pa. Jan. 29, 2018) ("[T]he mere fact that a plaintiff-specific defense is possible does not automatically defeat predominance"). Possible defenses "standing alone" do not automatically defeat predominance. *Bridging*

*Communities*, 843 F.3d at 1125 (reversing district court's denial of class certification and finding that common questions predominated despite defendant's speculation that some class members might have consented to receiving advertisements at issue) ("Here, [plaintiffs] presented evidence suggesting a class-wide absence of consent . . . . In response [defendant] merely alleged that class members *might* have given consent in some other way. The district court adopted this idea . . . even though [defendant] did not offer any information or evidence to support that theory."); *Patel v. TransUnion, LLC*, 308 F.R.D. 292, 308 (N.D. Cal. 2015) (certifying class under § 1681e and rejecting "defendants' main argument [] that the class members can prove the inaccuracy of the alerts only on an individual basis" because "given the record, it is reasonable to infer at this stage that there is not a fraction accurately tagged as potential terrorists that destroys predominance" and also noting "an over-inclusive class definition need not defeat certification entirely") (internal citation omitted).

In reversing the lower court's class certification, the *Cordoba* Court explained the district court had not actually wrestled with the question of absent class members' ability to show traceability and standing. *Cordoba*, 942 F.3d at 1275. The *Cordoba* Court noted that the "record on appeal is sorely lacking information" about (1) "how many class members (or what proportion of them) asked [the defendant] not to call them," as the named plaintiff did, and (2) "how do class members intend to prove that they made these requests?" *Id.* However,

"[i]f most class members made these requests, or if there is a plausible straightforward method to sort them out at the back end of the case, then the class might appropriately proceed as it is currently defined." *Id.* In the present case, the Court determines that Plaintiff has presented a plausible method of showing that the hard inquiries challenged were not authorized, i.e., inaccurate under Plaintiff's merits theory. Further, the Court has considered additional reasonable methods to address any necessary modification of the definition of the class based on further evidence produced in discovery as well as the use of a claims forms process that requires putative class members to provide a sworn attestation as to their lack of authorizations given to third-party inquirers.

Moreover, a consideration of the Eleventh Circuit's instruction in *Cordoba* in conjunction with its guidance in *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304-5 (11th Cir. 2021), reinforces the Court's conclusion above. Equifax's argument, and the R&R's analysis, is in effect that the administrative difficulties of ascertaining whether all of the proposed class members' injuries were traceable to Equifax's failure to reinvestigate is untenable. But the *Cherry* Court directed district courts to evaluate these types of feasibility issues in comparative terms. *Id.* at 1305. In so evaluating, a district court must consider (1) whether a class action would create more manageability problems than its alternatives and (2) how the manageability concerns compare with other advantages or disadvantages of a class action. *Id.* Further, "[a]dministrative feasibility alone will rarely, if ever, be dispositive." *Id.* Here, these issues of traceability and administrative feasibility

are interwoven. In evaluating this concern pragmatically, and in comparative terms, the Court concludes that these concerns of traceability and administrative feasibility do not warrant denial of class certification.

In recommending the denial of class certification, the Magistrate Judge did not give sufficient weight to Plaintiff's evidence, did not account for the fact that Equifax provided no specific evidence in rebuttal, and required Plaintiff's to present absolute proof of traceable injury (i.e., inaccuracy) for each class member at this stage of the proceedings. In so doing, the R&R did not conduct the required pragmatic assessment or evaluate the whole picture, based on all evidence and guided by the relevant principles outlined in *Cordoba* and *Cherry*, discussed above.

In sum, the evidence before the Court indicates that the class members have been identified and can establish inaccuracy, under Plaintiff's theory, by common evidence: class members' 300,000-plus dispute letters and Equifax's cataloguing of those letters as "unauthorized" or "not mine." Equifax's position that it might possibly be able to rebut these assertions of inaccuracy for some class members is insufficient to establish that individual questions predominate over the multiple common ones in the factual context of the record before the Court. Defendant's articulation of this contingent possibility does not substitute for specific evidence and does not erode Plaintiff's strong record before the Court. The evidentiary record in support of Plaintiff's class certification demonstrates at this juncture that, under Plaintiff's merits theory, Equifax's standard practice of

recording an unauthorized hard inquiry notation in consumer credit files and reports without investigation, correction, or deletion—despite documented consumers' requests for such—results in the distribution of "inaccurate" consumer credit information similarly injuring class members and constitutes a violation of the FCRA. This specific common factual and legal issue predominates and provides a proper basis for grant of class certification. Additionally, as recognized by the Magistrate Judge, whether Equifax's violation of 15 U.S.C. § 1681i(a) is willful constitutes a legal issue common to the class that properly is resolved on a class-wide basis. Nevertheless, as with any class action, the Court may be required to re-evaluate the scope, nature, or even existence of the class if presented with new evidence as this case proceeds.

### ii. "[N]otifies the agency directly, or indirectly through a reseller"

As excerpted above, § 1681i requires a credit reporting agency to conduct a reasonable reinvestigation or delete the disputed item where the "completeness or accuracy of any item of information" "is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller. . . ." 15 U.S.C. § 1681i.

Equifax contends that the requirement of a "direct" notification to the agency also defeats predominance because some of the dispute letters *could* have been sent by or with the aid of third parties, such as credit repair agencies. Plaintiff, on the other hand, argues that this determination is simple and could be accomplished administratively by looking at the face of the dispute letters

themselves and excluding any that were sent by credit repair agencies. Plaintiff also points out that, as with the "inaccuracy" discussion above, Plaintiff requested in discovery that Equifax identify any letters it believes were not sent "directly" by the consumer, and Equifax declined to do so.

In assessing whether a dispute came "directly" from a consumer, courts have generally reasoned that a consumer who was involved in either the drafting, finalizing, or sending of the dispute letter has sent the letter "directly" even if he had assistance in doing so. Only where an individual had no role in preparing, reviewing, or sending the letter, does he fail to satisfy the direct requirement. *See Henry v. Freedom Mortgage Corp.*, 2020 WL 8921079, at *4 (D. Ariz. Apr. 27, 2020) (finding that plaintiff sent letter directly where he, not credit repair organization, mailed letter, even if repair organization assisted with preparation of dispute letter) ("Plaintiff need only establish that he had some role in drafting, finalizing, or sending" the letter); *Warner v. Experian Information Solutions*, 931 F.3d 917, 921 (9th Cir. 2019) (issuing holding "limited to the facts before [the court]" that where plaintiff played *no* role in preparing the letters and did not review them before they were sent by credit repair organization, he did not "directly" send them); *Cohen v. Equifax Info. Servs.*, 2019 WL 5200759, at *6 (S.D.N.Y. Sept. 13, 2019) (finding that, where plaintiff only signed up for credit repair website and credit repair website submitted disputes, she did not send the disputes directly).

Here, contrary to Equifax's position and the Magistrate Judge's recommendation, the Court believes that assessing whether letters were sent directly or instead were sent by credit repair organizations can be "accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.'" *Souter v. Equifax Information Services, LLC*, 307 F.R.D. 183, 215 (E.D. Va. 2015) (citing Newberg on Class Actions § 4:50). Equifax has retained all of the dispute letters in their system. Under the above legal authority, the letters could be sorted based on objective criteria to determine if they were sent directly by the consumer or instead by a credit repair organization, like in *Cohen*, *supra*, 2019 WL 5200759, at *6.

If the determination of whether a dispute letter was sent "directly" were sufficient to defeat predominance, no § 1681i suit could ever be maintained as a class. But that is contradicted by the authority cited by Plaintiff. *See e.g., Norman,* 479 F. Supp. 3d at 139-143 ("Differentiating between bona fide consumers and third-party organizations does not seem like a difficult task, and certainly is not sufficient to defeat predominance")*, Chakejian v. Equifax Information Services LLC*, 256 F.R.D. 492 (E.D. Pa. 2009) (certifying class of Pennsylvania residents who disputed a public record included on their credit report, to whom Equifax sent standard letters); *Summerfield v. Equifax Information Services LLC*, 264 F.R.D. 133, 145 (D.N.J. 2009) (same, except with New Jersey residents).

In short, while weeding out dispute letters that were not sent "directly" from class members might require the investment of real administrative resources, this management task is not so significant as to defeat predominance or to overwhelm the advantages of allowing this case to proceed as a class action given the strong common core of important legal issues and evidence at play. *See Cherry v. Domestic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021) (explaining that administrative difficulties do not doom a motion for certification and that the Court must assess how manageability concerns based on administrative challenges compare with other advantages or disadvantages of a class action).

Accordingly, the requirement that a consumer notify Equifax directly of his dispute to the accuracy or completeness of an item in his credit file does not defeat predominance. Where the central issues in the action are common to the class, the action is proper under Rule 23(b)(3), even where other matters may have to be evaluated separately. *Bouaphakeo*, 577 U.S. at 453-454. Where the parties can determine, based on the evidence in Equifax's possession, if some of the letters were sent by credit repair organizations, those letters (and individuals) can be excluded from the class.

In addition to finding that common issues predominate, the Court also concludes that class resolution is the superior method of handling this dispute. As Plaintiff's counsel pointed out at oral argument, class-wide resolution is especially imperative here because most individuals faced with one, or a few, unauthorized hard inquiries on their credit reports will not be motivated or even

able to find representation to take on a billion-dollar credit reporting agency. "[T]he economies don't make that case worth it." (*See* Nov. 23 Hearing Transcript, Doc. 111 p. 68:14-22.) This is of course, a core purpose of class actions—to provide a mechanism to address small harm to many. Here, Equifax, faced with a class of individuals with the same complaint, responded identically to all of those individuals. Whether Equifax violated the FCRA by way of its common treatment and responses is a question ideal for common resolution.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff has established that the proposed class is sufficiently numerous, that there is at least one common question, that his claim is typical of the class, and that he is an adequate representative and therefore meets the Rule 23(a) requirements for a class action. Additionally, Plaintiff has established that questions of law or fact predominate and that the class is "sufficiently cohesive to warrant adjudication by representation." *Bouaphakeo*, 577 U.S. at 454. Specifically, the Court concludes that the evidence at this stage suggests that Plaintiff can make a showing of inaccuracy for all class members by common evidence. Any assertion by Equifax that it will be able to provide rebuttal evidence requiring individualized inquiry is hypothetical at this juncture. Moreover, critical questions in this case—whether a notation of an unauthorized hard inquiry constitutes an inaccuracy under the FCRA such that Equifax's standard policy for dealing with hard inquiry letters violates § 1681i, whether Plaintiff can show that any violation was willful, and

how Plaintiff can establish that unauthorized hard inquiries harm consumers—are common to all class members and predominate in this case. Therefore, this is a proper class under Rule 23(b)(3). The Court therefore **SUSTAINS** all of Plaintiff's Objections [Doc. 101] to the R&R but **ADOPTS** the undisputed aspects of the R&R [Doc. 98]. The Court **GRANTS** Plaintiff's Motion to Certify Class [Doc. 75]. The Parties are **DIRECTED** to proceed with merits discovery according to the schedule to be set by the Magistrate Judge. The Court accordingly refers this case back to the Magistrate Judge, for further proceedings, consistent with the holdings and guidance provided herein.

**IT IS SO ORDERED** this 30th day of March 2022.

**Honorable Amy Totenberg**
**United States District Judge**